UNITED STATES of America,
Appellee,

v.

Frank MAZZEI, Appellant.

No. 75–1357.

United States Court of Appeals,
Third Circuit.

Argued en banc May 8, 1975.

Decided July 29, 1975.

Certiorari Denied Dec. 8, 1975.
See 96 S.Ct. 446.

Richard L. Thornburgh, U. S. Atty., James J. West, Asst. U. S. Atty., for appellee.

John Rogers Carroll, Philadelphia, Pa., for appellant.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Defendant Frank Mazzei appeals from his conviction after a jury trial of two counts alleging extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1970). His challenge raises questions regarding the jurisdictional reach of the Hobbs Act and the substantive content of the crime of extortion which it defines.

The parties are in basic agreement on the facts. B.M.I., Inc., a Pennsylvania corporation and the victim of the alleged extortion, is the holding company of sixteen subsidiaries which engage in interstate businesses largely relating to the manufacture and installation of bulk refractory materials used in blast furnaces. B.M.I. is headquartered in a building at 700 Bingham Street, Pittsburgh, Pennsylvania, title to which is in the name of a wholly-owned subsidiary, Pneumatic Concrete Corporation. Accounting services for B.M.I. and all its subsidiaries are centered in the building and services such as billing and payments of accounts receivable are carried out by B.M.I. for all its subsidiaries from the office.

Prior to 1971, only one-half of the second floor of the Bingham Street building was occupied. Apart from B.M.I.'s offices on this floor, the remainder of

the second floor and the whole first and third floors were vacant. Leo Kelly ("Kelly"), secretary-treasurer of B.M.I. and all its subsidiaries, was anxious to lease the unused space to reduce overhead costs. Kelly spoke with Gerald R. Creehan, a director of a local bank, about the possibility of securing tenants. Mr. Creehan had learned that the defendant, a Pennsylvania state senator, was seeking office space on the Southside of Pittsburgh. Defendant was reportedly seeking a location in his district for the Pittsburgh regional office of the new Bureau of State Lotteries, even though as a legislator he had no statutory power with respect to the Bureau's leasing practices. Kelly asked Mr. Creehan to set up a meeting with the defendant.

A meeting was held in November 1971 between defendant and Kelly at which leases were mentioned but not discussed in detail. The defendant later visited the premises, and at Kelly's invitation, a dinner meeting was held on January 8, 1972, where leases were again discussed generally. At approximately the same time, the premises were inspected by a representative of the Department of Property and Supplies, the state authority responsible for securing office space for state agencies, to determine their suitability for occupancy as a lottery office.

Without prior notice, defendant visited Kelly at the B.M.I. office on January 11, 1972, to suggest the rental which B.M.I. should submit in its proposal to the state. Kelly testified that at this meeting defendant informed him that "it was the practice on all state leases that a ten per cent of the gross amount of the rentals would be paid to a senate finance re-election committee. . . ." The payment was to be in cash at the beginning of the lease. Defendant then proceeded to compute the gross rental and the ten per cent payment on a pad in Kelly's office. The page on which defendant had made his calculations was received into evidence at trial.

On January 13, 1972, Kelly submitted a proposal to the Department of Property and Supplies for lease of a portion of the first floor of the Bingham Street building to the Bureau of Lotteries. The executed lease was received from the state on March 23 or 24, 1972, and shortly thereafter defendant inquired of Mr. Creehan whether Kelly had left an envelope for defendant at Creehan's bank. At defendant's request, Mr. Creehan relayed the message to Kelly, who authorized the withdrawal and delivery to defendant of $8,755, which Kelly computed to be ten per cent of the gross rental B.M.I. would receive under the lease. The money was delivered personally to defendant in late March 1972.

In November or December 1972, defendant stopped in at the B.M.I. offices to ask Kelly if he was interested in leasing space to the Department of Labor and Industry, again an executive agency with which defendant had no statutory connection. On December 27, 1972, defendant brought officials from the Departments of Property and Supplies and Labor and Industry to view the premises. Other state officials visited during the spring of 1973. Sometime shortly before April 14, 1973, Kelly and defendant discussed B.M.I.'s proposal for the Labor and Industry lease. Defendant again suggested the rental B.M.I. should propose and informed Kelly that the same ten per cent arrangement would be in effect. B.M.I. submitted a proposal, later revised at defendant's behest, that led to receipt of an executed lease from the state on July 20, 1973. After defendant indicated that he had to have his cash payment that same day, Kelly delivered $11,300 (10% of the gross rental) to defendant's secretary at his nearby office. Defendant acknowledged receipt of the money by telephone.

On appeal, defendant challenges his conviction on two grounds: (1) the transactions from which the charges arose lacked sufficient impact on interstate commerce to give rise to federal jurisdiction over them and (2) his receipt of

money did not amount to extortion within the meaning of the Hobbs Act. Defendant also challenges a portion of his sentence which ordered his removal from state office as beyond the power of the district court.

*Effect on Interstate Commerce*

Defendant acknowledges that in enacting the Hobbs Act, Congress intended to "use all the constitutional power [it] has to punish interference with interstate commerce . . . ." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). He contends, however, that the transactions involved here did not touch upon interstate commerce and that, therefore, the Hobbs Act cannot constitutionally be construed to embrace his conduct.

Defendant has admitted that although B.M.I. does no interstate business itself, it is "legitimate" to identify B.M.I. with its wholly controlled subsidiaries that are engaged in substantial interstate operations. Conceding the interstate character of the B.M.I. enterprise, defendant still contends that federal jurisdiction is lacking because the lease transactions in which B.M.I. were engaged here are "local" in nature. He urges that only if we can find that the lease transactions themselves affected interstate commerce may we assess the impact of the alleged extortion on interstate commerce.

The government, on the other hand, urges us to find both federal jurisdiction and Hobbs Act coverage on the theory that some $20,000 in payments to defendant depleted the assets of B.M.I. and thereby affected its power to operate in interstate commerce. This position accords with our previous holdings that where the resources of an interstate business are depleted or diminished "in any manner" by extortionate payments, the consequent impairment of ability to conduct an interstate business is sufficient to bring the extortion within the play of the Hobbs Act. *United States v. Addonizio,* 451 F.2d 49 (3rd Cir. 1971),

*cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Provenzano,* 334 F.2d 678 (3rd Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). Defendant would distinguish these cases on the ground that in each there was a direct and immediate effect on interstate commerce that is wholly lacking here.

■ Despite the local character of the lease transactions giving rise to the alleged extortion in this case, we are of the opinion that the depletion of B.M.I.'s assets provides a jurisdictional basis under the Hobbs Act for the maintenance of this action. B.M.I. owns subsidiaries which purchase materials in a number of states for use in manufacturing products sold in almost every state. As a result of defendant's actions, funds available to B.M.I. for use in such interstate activities have been diminished and its interstate business must to this extent be curtailed. Because of this effect on interstate commerce, the fact that the alleged extortion arose from a local lease to a state agency is not dispositive, for "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States v. Women's Sportswear Mfrs. Ass'n,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949). Although enunciated in an antitrust context, the principle stated in the quoted language has broad application to questions regarding congressional power under the commerce clause. *See, e. g., Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

We therefore conclude that the Hobbs Act may constitutionally be construed to reach the indirect burdens placed on interstate commerce by the extortionate activities alleged in this case and that such a construction of the statute accords with Congressional intent to proscribe extortion which "in any way or degree obstructs, delays, or affects commerce." 18 U.S.C. § 1951(a).[1] *United*

---

1. We do not consider that an absence of effect on interstate commerce is shown by the fact

that B.M.I. had a net cash inflow by reason of entering into the leases. Although B.M.I. un-

*States v. De Met,* 486 F.2d 816 (7th Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); *United States v. Augello,* 451 F.2d 1167 (2d Cir. 1971), *cert. denied,* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972); *cf. United States v. Staszcuk,* 517 F.2d 53 (7th Cir. 1975); (in banc) *cert. pet. filed* 43 U.S.L.W. 3675 (June 13, 1975) (jurisdiction under the Hobbs Act may be satisfied by showing a "realistic possibility that an extortionate transaction will have some effect on interstate commerce.") .

*Extortionate Nature of Defendant's Conduct*

Defendant also contends that his conduct, whatever other laws it might violate, does not constitute extortion within the meaning of the Hobbs Act. The statute defines extortion as

The obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

Defendant characterizes the payments made to him as B.M.I.'s voluntary purchase of his influence in an area in which he had no official power and in which he never pretended to have any official power. He further contends that there was no element of coercion present, and that therefore he could not be guilty of extortion even if he had been acting "under color of official right."

■ It is clear, of course, that defendant had no statutory power as a state senator to control the granting of leases by state executive agencies. But in order to find that defendant acted "under color of official right," the jury need not have concluded that he had actual *de jure* power to secure grant of the lease so long as it found that Kelly held, and defendant exploited, a reasonable belief that the state system so operated that the power in fact of defendant's office included the effective authority to determine recipients of the state leases here involved. *See United States v. Price,* 507 F.2d 1349 (4th Cir. 1974) (per curiam); *United States v. Staszcuk, supra* (adopting by reference the panel opinion at 502 F.2d 875 (7th Cir. 1974) on this point). Such an exploitation involves the wrongful use of official power that has long been punished at common law as extortion "under color of public office." *See, e. g., Commonwealth v. Wilson,* 30 Pa. Super. 26 (1906). The issue of Kelly's belief and its reasonableness was a jury question which was submitted under appropriate instructions.[2]

Kelly's belief in defendant's power over state leases in his district is amply established by the record. In his most succinct statement in this respect, Kelly testified:

I thought that was the method that state leases were handled. I just accepted it as gospel.

 ·   ·   ·   ·   ·

I don't know how it works in Harrisburg. . . . [T]here has to be that influence and power, and they were letting the senator do it.

Furthermore, we find after a careful review of the record in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), that the evidence permitted the jury to find that Kelly's belief in defendant's power was reasonable. With respect to the first lease, we note that there were rumors that defendant was looking for space for

---

doubtedly used defendant's influence to put itself in a position where the award of state leases was likely, at that point it had the right to receive the full rental, described by state officials as completely reasonable, without paying defendant some $20,000 to insure that the lease opportunities were not lost.

2. A portion of the court's instruction was that the defendant could be convicted if the jury found "that Leo Kelly reasonably believed that the senator's official functions included the securing of leases with the Commonwealth of Pennsylvania" and "that Senator Mazzei used his office or wrongfully used his official power."

the lottery office. Kelly's meetings with defendant in December 1971 and January 1972 produced an inspection by an official of the Department of Property and Supplies even though no one from B.M.I. had contacted anyone other than defendant. Also, defendant suggested that B.M.I. propose to the state a rental of $4.25 per square foot, which he said was the rate at which a recent state lease in Philadelphia had been awarded and the highest that the state would approve. These representations by the defendant himself suggest an intimate awareness of state leasing practices.

When defendant opened negotiations with respect to the second lease and brought officials to inspect the premises, other officials from the Department of Labor and Industry appeared without any request from B.M.I. personnel. As with the lottery lease, defendant suggested a proposed rental for submission to the state, this time at $4.90 per foot because parking spaces would be provided. When B.M.I. did not follow his recommendation and submitted to the state a proposal of $4.35 per foot that excluded janitorial services, defendant quickly called Kelly to advise him that the proposal should be at the higher rate he suggested and must cover janitorial services. Kelly told defendant to "put it in at $4.90," and without the submission of a revised proposal by B.M.I., the state returned a lease with a rate of $4.90 which required B.M.I. to provide the additional services. Furthermore, on two occasions in July 1973, defendant assured Kelly that B.M.I. would secure the Labor and Industry lease. One such assurance was given in a meeting on July 18, 1973, where defendant calculated the five year gross rental figure, on which the ten per cent payment would be based, on a paper introduced into evidence at trial. In these computations, defendant used a yearly rental of $22,569.40, the rental computed at the $4.90 rate and the exact rental stated in the lease received by B.M.I. from the state two days later.

Thus, defendant had the ability to initiate state inspection of the premises, to specify rental rates that would be and were acceptable to the state, and to alter B.M.I.'s proposal on the second lease. Also, throughout the lease negotiations, defendant displayed to Kelly intimate knowledge of the decision making process involved in the granting of state leases. This, in our view, constituted sufficient evidence to justify a finding by the jury that Kelly could reasonably have believed that as a concomitant of his official position defendant possessed not mere influence over state leases but in fact had effective power to determine to whom these leases were awarded even though his office gave him no such *de jure* power.

■ Defendant urges, however, that even if he did have some power to influence the awarding of state leases, he still did not commit extortion in his receipt of payments of some $20,000 from B.M.I. He acknowledges that in *United States v. Kenny,* 462 F.2d 1205 (3rd Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), we held that the Hobbs Act is to be read disjunctively and approved an instruction that extortion could be established either when property is obtained through the use of fear or by one acting under color of official right. 462 F.2d at 1229. He contends, however, that a coercive use of office must be established even when the prosecution is based on the alternate ground of "color of official right," and relies on the statement of this court in *Addonizio* that "while the essence of bribery is voluntariness, the essence of extortion is duress." 451 F.2d at 72. We do not agree with this contention because we are satisfied that in such a prosecution, any element of coercion that may be required to establish extortion under the Hobbs Act is supplied by the misuse of the defendant's official power.

The definition of extortion in the Hobbs Act is substantially that of its predecessor statute, the Anti-Racketeering Act of 1934, ch. 569, §§ 1–6, 48 Stat. 979. Unfortunately, however, the legislative history of neither statute provides

any hint of congressional intent in adopting this definition of extortion, other than statements by proponents of the Hobbs Act that the statute did no more than incorporate the conventional definition of extortion contained in New York law. *See, e. g.,* 91 Cong.Rec. 11842 (1945) (remarks of Rep. Walter); *id.* at 11843 (remarks of Rep. Michener).

■ We must, therefore, look to the face of the statute to determine its meaning. As we noted in *Kenny,* the "under color of official right" language

> repeats the common law definition of extortion, a crime which could only be committed by a public official, and which did not require proof of threat, fear, or duress. 462 F.2d at 1229, citing *United States v. Nardello,* 393 U.S. 286, 289, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969).

Under the common law definition, color of public office took the place of the coercion implied in the ordinary meaning of the word extortion. *United States v. Sutter,* 160 F.2d 754 (7th Cir. 1947). Further support for the proposition that overt coercion need not be proved in a Hobbs Act prosecution for receipt of property "under color of official right" is supplied by the disjunctive wording of the statute which strongly implies that a showing of "force, violence or fear" is not required when the prosecution is based on the theory that money was obtained through wrongful exercise of the power of office.

■ We conclude that *Kenny* properly read the statute and that a showing of the inducement of payments "under color of official right" may replace proof of the coercion of "force, violence or fear" in a Hobbs Act prosecution. A violation of the statute may be made out by showing that a public official through the wrongful use of office obtains property not due him or his office, even though his acts are not accompanied by the use of "force, violence or fear." *United States v. Staszcuk, supra* (adopting by reference the panel opinion at 502 F.2d 875 (7th Cir. 1974) on this point); *United*

*States v. Price, supra.* We do not construe *Addonizio* to hold to the contrary, since that case was submitted to the jury only on the theory that money had been obtained through the use of fear, and the question presented here and in *Kenny* was not before the court there.

We are convinced, therefore, that the evidence in this case justified a finding by the jury that the payments to defendant were induced by an exploitation of Kelly's reasonable belief that defendant's position as a state senator provided him with effective control over the state leases here involved even though he lacked *de jure* authority to act in this sphere. In consequence, we conclude that consent to the payments was "induced . . . under color of official right" and in violation of the Hobbs Act even without proof of the exercise of overt coercion.

### Removal From Office

■ In its sentence of April 11, 1975, the district court ordered defendant removed from office as a Pennsylvania state senator. On June 2, 1975, the Pennsylvania Senate purported to expel defendant from office. Although we take notice of the Senate's action, we reject the government's urgings that because of the intervening expulsion we should decline to treat the question of the propriety of the order of removal on the ground of mootness. In the first place, we cannot assume that defendant concurs in the propriety of his expulsion by the Senate, and this matter has not yet been adjudicated. Thus, the controversy regarding his right to remain in the state Senate is still a live issue. In addition, failure to address the issue of removal would leave unresolved a challenged assertion of the power of a federal court to remove a state official from office. The significance of the assertion of federal power by the district court in this particular context demands that we determine defendant's challenge.

■ The district court purported to act pursuant to a Pennsylvania statute,

65 P.S. § 121 (Supp.1974), which provides that upon conviction in a court of record of extortion or other specified crimes, any person holding public office "shall forfeit his office, and the sentence imposed by the court shall include the direction for the removal from office of such person." The government contends that although the district court had no power to impose any penalty beyond that specified by Congress for violation of the Hobbs Act, it did have the power to enforce what the government construes as an automatic forfeiture of office by operation of the Pennsylvania statute. It offers alternate theories to sustain the district court's order: (1) removal could be imposed as a condition of release pending appeal; (2) the court has the inherent power to enforce the policy expressed in the statute; or (3) the court could take notice of and enforce a collateral consequence of defendant's conviction.

We perceive no basis upon which the district court's order of removal was justified. Removal from office was in no sense imposed as a condition of release pending appeal, and indeed, could not have been, since release after conviction is determined on the basis of considerations of likelihood of flight and danger to the community, 18 U.S.C. § 3148 (1970), and not on whether defendant might infringe the public policy of Pennsylvania by remaining in office. Nor can we find any authority for inherent power in the district court to enforce the policy of the Pennsylvania statute. As a court of limited jurisdiction, the district court possessed only the power to act in this criminal case which Congress has given it by statute. As the Supreme Court has stated:

> The law of our country takes care . . . that not the weight of a judge's finger should fall upon any one, except as specifically authorized. *In re Bonner,* 151 U.S. 242, 259, 14 S.Ct. 323, 326, 38 L.Ed. 149 (1894).

We can see no escape from this principle by arguments that the district court's order was not penal in nature, but merely the enforcement of a "judicially noticeable collateral consequence of defendant's conviction." The simple and unassailable fact is that Congress has given the district court no power to take any action in sentencing a defendant except to impose a punishment within the limits prescribed by statute. The order of removal was beyond the power of the court.

The order directing defendant's removal from office is separate and distinct from the remainder of the district court's sentence. We are in a position, therefore, to adjudicate its invalidity without disturbing the clearly authorized sentence of fines and imprisonment. For this reason, we will exercise our power to correct the sentence rather than remanding the case for the execution of this ministerial act.

The judgment of the district court will be modified by deleting that portion directing that defendant be removed from the office of Pennsylvania State Senator. As thus modified, the judgment will be affirmed.

GIBBONS, Circuit Judge, dissenting, with Circuit Judge ALDISERT joining.

This case, which is one of first impression nationally at the appellate level, requires us to explore the reach of the Hobbs Act's proscription of extortion. 18 U.S.C. § 1951(a). More particularly, this case deals with that branch of § 1951(b)(2) which defines "extortion" as "the obtaining of property from another, with his consent . . . under color of official right." Does the Act prohibit a person having no *official* position in, or control over, a state executive branch department from taking money in exchange for the exercise of political influence over two decisions by that department? Of course, the majority does not make so bald a statement of the issue. Rather they choose nominally to rely upon the fact that the appellant, Mazzei, held the office of senator in the state government's legislative branch.

They choose to ignore the fact that *it was Mazzei's influence, not his office,* which accomplished the results for which the payments were made. On this record, I can conclude only that Mazzei's willing victim perceived him to be exactly what he was—a power-broker. In Kelly's eyes, at least, Mazzei's position was no different from that of an influential state or county political leader holding no office whatsoever. If Mazzei violated the Hobbs Act by representing that he had the *de facto* power to influence the state executive department's decisional processes, then anyone, whether in or out of office, can also be convicted. This may be a desirable result—in the abstract. It is not, I submit, what Congress intended when it enacted the Hobbs Act.

### I. Areas of Agreement and Disagreement

Assuming Congress had made the conduct a crime, I agree that the transaction alleged in the indictment had a sufficient impact upon interstate commerce to sustain constitutionally the exercise of federal criminal jurisdiction.[1] I agree, as well, that § 1951(b)(2)'s definition of extortion should be read disjunctively to cover either coercive extortion or receipt of money under color of official right.[2] Moreover, I agree that examined in the light most favorable to the government,[3]

the evidence permitted the jury to conclude that Kelly, the all-too-willing victim, had a reasonable belief that Mazzei had the *de facto* power to influence the state's leasing decisions. But I do not find any evidence in the record suggesting that Kelly had any ground for believing that the 10% commission on gross rentals was an official emolument of the office of state senator, nor does the majority suggest that any such evidence exists. The majority's holding is found in this one sentence:

> "But in order to find that defendant acted 'under color of official right,' the jury need not have concluded that he had actual *de jure* power to secure grant of the lease so long as it found that Kelly held, and defendant exploited, a reasonable belief that the state system so operated that the power in fact of defendant's office included the effective authority to determine recipients of the state leases here involved." (Majority op. at 643).

A review of the transcript reveals that the district court did *not* charge that the jury had to find that Kelly had a reasonable belief "that the state system so operated that the power in fact of defendant's office included the effective authority to determine recipients of the state leases."[4] Thus the majority is af-

---

1. *United States v. Addonizio,* 451 F.2d 49 (3d Cir. 1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Provenzano,* 334 F.2d 678 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964).

2. *United States v. Kenny,* 462 F.2d 1205, 1228–29 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972).

3. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

4. The court charged:

"Extortion under color of official right is the wrongful taking by a public official, such as a state senator, of money not due to the official or due to his office.

Extortion, as defined by federal law, is committed when money is wrongfully obtained by consent of the victim under color of official right. When so obtained, the crime has been committed.

The use of public office to obtain payments of money is the crux of the statutory requirement under color of official right. Wrongful use of official power can be a basis for extortion. It matters not whether the public official induces payments of money to perform his duties or not to perform his duties. It matters not whether the public official performs acts or does not perform acts unrelated to his duties which can only be undertaken because of his official position.

So long as the motivation of payment of money by the victim focuses on the public official's office, the conduct violates the Hobbs Act. Thus, if you find that Senator Mazzei held himself out to BMI, Incorporated as being in a position to influence the granting of the leases in question, you need not find that he was actually legally empowered to do so, to find he was asking under color of official right." (Tr. at 942–43).

firming on a different theory from the one actually presented to the jury.

Explicating that portion of the charge reprinted in the margin,[5] we see that the district court defined the term "under color of official right" first negatively and then affirmatively. In the negative portion the court made clear that the jury did not have to find that the payments had anything to do with the performance or non-performance of senatorial duties, or with the performance or non-performance of "acts unrelated to [such] duties which can only be undertaken because of his official position." Thus, by negative definition the charge excluded the necessity for a finding that a state system placed even the *de facto* decisional responsibilities in the state senator as such. Nor did the district court charge that Kelly had to have had a reasonable belief in the existence of such a system. The key sentences in its affirmative definition of "under color of official right" are these:

"So long as the motivation of payment of money by the victim focuses on the public official's office, the conduct violates the Hobbs Act. Thus, if you find that Senator Mazzei held himself out to BMI, Incorporated *as being in a position to influence the granting of the leases in question*, you need not find that he was actually legally empowered to do so, to find he was acting under color of official right." (Tr. at 943) (emphasis added).

If we look at the charge on official right in its entirety the most that can be said to have been submitted to the jury was that it must find (a) that Mazzei was a Senator, and (b) that he represented that *he, not his office*, had the power to influence the granting of the leases. Moreover, the charge is sufficiently ambiguous so that the jury may well have understood the reference to the public official's office as a reference not to the office of state senator but to an "office" exerting *de facto* power in the Bureau of Lotteries or the Department of Labor

and Industry. But let me resolve this ambiguity in favor of the government. Then I must conclude that the case was submitted to the jury on the theory that the Hobbs Act is violated when an influence peddler, who is also a state senator, says that for a fee he can influence the decisions of a different governmental branch and does so.

The district court understood perfectly well that it was giving the case to the jury on an influence peddling charge having nothing to do with the *de jure* or *de facto* powers of the office of state senator. It expressly declined to charge these defendant's requests:

"5. Extortion under color of official right occurs when a public officer, including elected officers, obtains anything of value under the pretense that the officer was entitled to it by virtue of his office. If a person who happens to be a public officer renders a service in his private capacity and demands a payment therefor or makes any demand in his private capacity, it is not extortion because it was not done under color of official right.   .   .   .

6. (Alternate request:   Extortion) Before you can convict defendant of inducing payments under color of official right, you must be satisfied beyond a reasonable doubt that the following occurred:

.     .     .     .     .

(c) that Senator Mazzei performed acts which could only be undertaken because of his official position;

(d) that the motivation for payment focused on defendant's position as a senator as distinguished from his ability to exert political influence." (II App. at 356a–57a).

Contrasting the charge as given with the requests to charge that were explicitly rejected, it simply cannot be said that the case went to the jury on the theory that it could convict if it found that there was or was represented to be a state system vesting power over leases in

**5.**  *See* note 4 *supra*.

the state senator. Nor did the district court understand that the jury had to find that the victim entertained any belief, reasonable or otherwise, on the subject of official right, for the court totally rejected defendant's request to charge number 7 reprinted in the margin.[6]

My areas of disagreement with the majority, then, are threefold. First, I do not agree that the case was submitted to the jury on the theory that Mazzei represented that state senators had by virtue of a state system the *de facto* emolument of office of control over leasing decisions.[7] Second, I do not agree that the charge as given defines a crime under the Hobbs Act. Third, I do not believe that the Hobbs Act reaches the offense which the majority has constructed, rather than that actually defined in the court's charge.

## II. The Authorities

No authority in this circuit has held the "under color of official right" portion of § 1951(b)(2) covers influence peddling. In the three cases in which we have applied the Hobbs Act to state public officials, the money extorted was taken by or on behalf of the persons holding municipal offices vested with decisional responsibility for the desired end. *United States v. Somers*, 496 F.2d 723 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. Kenny*, 462 F.2d 1205 (3d Cir.), *cert.*

*denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972); *United States v. Addonizio*, 451 F.2d 49 (3d Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). To the extent that defendants not holding the offices responsible for the desired end were involved in those cases, they were properly included by virtue of 18 U.S.C. § 2(a). But Mazzei is not charged with having participated in obtaining money on behalf of or in aid of someone holding an office in the executive branch of Pennsylvania government. Rather, he is charged with obtaining money for himself by virtue of his influence there. Since there are no Third Circuit cases applying the color of official right provision to an influence peddler the majority looks outside this circuit to *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1975), *petition for cert. filed*, 43 U.S.L.W. 3675 (U.S. June 24, 1975) where the en banc court adopted, by reference, the panel opinion at 502 F.2d 875 (7th Cir. 1974), and to *United States v. Price*, 507 F.2d 1349 (4th Cir. 1974) (per curiam). These are slim reeds upon which to base a major enlargement of federal criminal law enforcement jurisdiction. The per curiam dictum in *Price* is particularly insignificant since the court actually holds that the conviction was sustainable under the other branch of § 1951(b)(2) dealing with coercion. But even on the color of official right aspect, the case involved

6. "7. COLOR OF OFFICIAL RIGHT: In determining whether the money was obtained under color of official right you must consider all of the facts upon which Mr. Kelly acted. Did he seek out Senator Mazzei or did the senator seek him out? Did he believe from the outset that the agreement between him and the senator involved an official task of the senator or an unofficial, political favor? *Did he believe that he was paying the money for something the senator was supposed to do as a senator? Did he know that the ultimate decision was in the hands of the Lottery Bureau, the Department of Properties and Supplies?* Did the documents, including the original proposal and the leases themselves, place him on notice that Senator Mazzei could not exert any official influence in securing the leases? Did he know or should he have known that, once

the leases were obtained, payment to the senator was not payment for any official conduct and therefore not under color of official right? Did the manner by which the corporation treat the payments on their books and records reveal that it was making a political contribution and therefore not paying under color of official right? Ultimately, you should ask yourselves whether Mr. Kelly agreed to pay for the senator's efforts in getting all of the parties together so that BMI could get preferential consideration for leases which Mr. Kelly knew had to be approved by others than Senator Mazzei." (II App. at 357a) (emphasis added).

7. I concede that viewed in the light most favorable to the government the evidence would have supported such a finding, had such a charge been given.

a city councilman who led his victim to believe that *as such* he had *de facto* power to prevent the issuance of an occupancy permit. The jury was instructed that

> "[t]he issue . . . is not whether the defendant had the power to withhold the permit, but whether it was reasonable for [Scotsman to believe] that he . . . had such power." *Id.* at 1350.

The appeal raised only the issue whether the jury must have found *de jure* statutory power in the councilman. The case simply did not involve influence peddling. *Staszcuk* involved a payment to an alderman, who *as such* had standing before the appropriate zoning authority to oppose a zoning application in his ward, for refraining from opposing the application. The payment was for the purpose of influencing the defendant's conduct as alderman, not for purchasing his influence with others. An alderman clearly is a public official, and Staszcuk took money under color of that office to influence his conduct in that office. Neither *Price* nor *Staszcuk* deal with payments for influence over third-party conduct. No case to which we have been referred has ever applied the Hobbs Act in the circumstances presented by this record.

### III. Mazzei's Conduct Did Not Constitute Common Law Extortion

At common law extortion was an offense that could only be committed by a public officer. In Blackstone's words, "*extortion* is an abuse of public justice, which consists in any officer's unlawfully taking, by colour of his office, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." [8] Since the essence of the offense was the abuse of the public

trust that inhered in the office there never was any doubt that the powers of the office under color of which the defendant acted, or pretended to act, must, if actually held, have made possible the effectuation of the extortionate act. *See, e.g.,* II J. Bishop, *Commentaries on the Criminal Law* § 329, at 246 (2d ed. 1859); R. Desty, *A Compendium of American Criminal Law* § 84a, at 214–16 (1887); J. May, *Law of Crimes* § 81, at 104–05 (4th ed. K. Sears & H. Weihofen 1938); 3 F. Wharton, *Criminal Law & Procedure* § 1393, at 790–91 (R. Anderson ed. 1957). A leading case describes the crime thus:

> "The offense consists in the oppressive misuse of the exceptional power with which the law invests the incumbent of an office. It is thus apparent that the crime of extortion is committable only by an officer. The officer need not possess a legal title to the office whose functions he executes. A person who serves as an officer, and claims to be one is estopped to deny his official appointment. 2 Bish. Cr. Law, § 392. So it appears that a de facto as well as a de jure officer is punishable for extortion, as he is for any other malfeasance in office. But an official character, either de facto or de jure, is essential. The indictment is drawn in the usual form, and charges that the defendants were officers, and, by color of their office, extorted. This is a material averment, proof of which is absolutely required to support a conviction." [9]

*Kitby v. State,* 57 N.J.L. 320, 321–22, 31 A. 213, 213–14 (Sup.Ct.1894).

Mazzei never pretended to hold any executive department office nor did he pretend that he could personally award the leases. He did no more than repre-

---

**8.** 4 W. Blackstone, Commentaries *141.

**9.** *See, e.g., United States v. Nardello,* 393 U.S. 286, 289, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969); *United States v. Sutter,* 160 F.2d 754, 756 (7th Cir. 1947); *United States v. Laudani,* 134 F.2d 847, 851 n.1 (3d Cir. 1943), *rev'd on other*

grounds, 320 U.S. 543, 64 S.Ct. 315, 88 L.Ed. 300 (1944); *Dunlap v. Curtis,* 10 Mass. 210 (1813); *State v. Begyn,* 34 N.J. 35, 167 A.2d 161 (1961); *State v. Weleck,* 10 N.J. 355, 371, 91 A.2d 751, 759 (1952); *Commonwealth v. Wilson,* 30 Pa.Super. 26, 30 (1906); *The Queen v. Baine,* 87 Eng.Rep. 946.

sent that he could influence those executive department officers who controlled the granting of leases. This was not common law extortion. Mazzei was not misusing the office of senator. He was misusing his personal political power to influence the conduct of another officer.

## IV. The Statutory Offense

There is no federal common law of crimes. Nevertheless, when Congress uses words of technical import at common law one must, in the absence of contrary indications, assume that Congress intended to incorporate at least some of the common law meaning. As the majority opinion points out, the word "extortion", as used in § 1951(b)(2), first appeared expressly in the Anti-Racketeering Act of 1946 [10] which amended the Anti-Racketeering Act of 1934.[11] The 1934 statute was addressed primarily to labor racketeering, and contained no express reference to extortion. It did, however, proscribe both what might be described as statutory extortion—that is, obtaining payments by use or threat of use of force—and what must have been intended as common law extortion—that is, obtaining property "under color of official right." [12] The wording of the 1934

10. Act of July 3, 1946, ch. 537, 60 Stat. 420. The 1946 version of § 1951 was modified by Act of June 25, 1948, ch. 645, 62 Stat. 793 to read as it does today. The 1946 version read, in pertinent part, as follows:

"Sec. 1. As used in this title—

(a) The term 'commerce' means (1) commerce between any point in a State, Territory, or the District of Columbia and any point outside thereof, or between points within the same State, Territory, or the District of Columbia but through any place outside thereof, and (2) commerce within the District of Columbia or any Territory, and (3) all other commerce over which the United States has jurisdiction; and the term 'Territory' means any Territory or possession of the United States.

(b) The term 'robbery' means the unlawful taking or obtaining of personal property, from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or anyone in his company at the time of the taking or obtaining.

(c) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
Sec. 2. Whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion, shall be guilty of a felony.
Sec. 3. Whoever conspires with another or with others, or acts in concert with another or with others to do anything in violation of section 2 shall be guilty of a felony.

Sec. 4. Whoever attempts or participates in an attempt to do anything in violation of section 2 shall be guilty of a felony.
Sec. 5. Whoever commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of section 2 shall be guilty of a felony.
Sec. 6. Whoever violates any section of this title shall, upon conviction thereof, be punished by imprisonment for not more than twenty years or by a fine of not more than $10,000, or both."

11. Act of June 18, 1934, ch. 569, 48 Stat. 979.

12. The 1934 Act read in pertinent part:
"Sec. 2. Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—
(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or
(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or
(c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate sections (a) or (b); or
(d) Conspires or acts concertedly with any other person or persons to commit any of the foregoing acts; shall, upon conviction thereof, be guilty of a felony and shall be punished by imprisonment from one to ten years or by a fine of $10,000 or both."
Act of June 18, 1934, ch. 569, § 2, 48 Stat. 979–80.

statute presented some difficulties in its application to labor racketeering, and received a fairly narrow reading in *United States v. Teamsters Local 807*, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942). In specific reaction to that decision the 1946 statute was enacted.[13] Structurally it differed from the 1934 Act in several respects. Those differences important for our purposes are that the first section contains a definition of the term "extortion" and for the first time proscribed "extortion" in specific language. But the definition in § 1(c) of the 1946 Act, now § 1951(b)(2), although it broadened the description of coercive extortion somewhat,[14] merely carried forward the "under color of official right" language of § 2(b) of the 1934 Act. Thus whatever congressional intention may be ascribed to that term must be found in the records of the Seventy-third Congress.

There is no legislative history extant tending to show that the 1934 Act was intended to empower federal authorities to police influence peddling in the political processes of the states.[15] Whatever legislative history there is suggests a contrary conclusion. The 1934 Act originated in the Senate as S. 2248, 73d Cong., 2d Sess. (1934), reprinted in 78 Cong.Rec. 457–58 (1934). It was proposed by Senators Copeland, Vandenberg and Murphy and contained no reference to extortion by "color of official right."

After passing the Senate, 78 Cong.Rec. 5734 (1934), it was submitted in the House, where it was completely amended and a new bill substituted. The reasons for this amendment have been described by the Supreme Court in *United States v. Teamsters Local 807, supra*, at 529, 62 S.Ct. at 645, as follows:

> "After the bill had passed the Senate, however, representatives of the American Federation of Labor expressed fear that the bill in its then form might result in serious injury to labor, and the measure was redrafted by officials of the Department of Justice after conferences with the President of the Federation."

With the House revision the term "color of official right" appeared for the first time.

The House Report, submitted along with its new version of S. 2248 (H.R. 6926), was short. In addition to reprinting the text of the new bill, it reprinted a letter written by Homer Cummings, then Attorney General, to Hatton W. Sumners, Chairman of the House Judiciary Committee. H.R.Rep.No.1833, 73d Cong., 2d Sess. 2 (1934). In *United States v. Teamsters Local 807*, the Supreme Court placed heavy emphasis on this letter as a tool to interpret the 1934 Act. The letter, which I have reprinted in the margin,[16] is particularly useful.

---

**13.** H.R.Rep.No.238, 79th Cong., 2d Sess., reprinted in 1946 U.S.Code Cong.Serv. 1360, 1370.

**14.** *Compare* § 1(c) of the 1946 Act, *supra* note 10 *with* § 2(b) of the 1934 Act, *supra* note 12.

**15.** See S.Rep.No.532, 73d Cong., 2d Sess. (1934); H.Rep.No.1833, 73d Cong., 2d Sess. (1934).

**16.** "DEPARTMENT OF JUSTICE, Washington, D. C., May 18, 1934
Hon. HATTON W. SUMNERS,
Chairman of the Judiciary Committee, House of Representatives, Washington, D. C.
Dear Mr. Sumners: I am enclosing herewith the new draft of the antiracketeering bill, S. 2248, which has been prepared upon the informal suggestion of your committee as a substitute for the bill which your committee has under consideration.

After a series of conferences with Mr. Keenan and Mr. Rice, this draft has been definitely approved by Mr. William Green, president of the American Federation of Labor, and James S. Easby-Smith, Esq., counsel for Mr. Green.

We believe that the bill in this form will accomplish the purposes of such legislation and at the same time meet the objections made to the original bill.

The original bill was susceptible to the objection that it might include within its prohibition the legitimate and bona fide activities of employers and employees. As the purpose of the legislation is not to interfere with such legitimate activities but rather to set up severe penalties for racketeering by violence, extortion, or coercion, which affects interstate com-

By negative implication, the letter's failure to discuss "extortion under color of official right" suggests that the draftsmen did not intend the prohibition to reach conduct not extortionate at common law. One would expect at least a passing comment to be made by the draftsmen if they intended to attach revolutionary meaning to a term of art, long known and used.

The conclusion that the statute was not intended to revolutionize the meaning of "color of official right" is buttressed by a comment made by Congressman Oliver of New York, who apparently submitted this bill in the House, after it had cleared committee:

"This is *merely* the creation of an extortion statute against those who extort money by force or violence from those engaged in interstate commerce." 78 Cong.Rec. 11402 (1934) (emphasis supplied).

There is little doubt that the draftsmen of the 1934 Act took the term "color of official right" from the New York Penal Law of 1909. Section 850 of that law, which defined the crime of extortion, read as follows:

"Extortion is the obtaining of property from another, or the obtaining the property of a corporation from an officer, agent or employee thereof, with his consent, induced by a wrongful use of force or fear, or under color of official right." [17]

Compare this language with § 2(b) of the 1934 Act:

"Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; "

The similarity between the two definitions must be more than accidental.

While the meaning attributed to the term "color of official right" by the New York legislature and courts is by no means dispositive of the congressional intent in using the phrase, it is highly persuasive both because its meaning in New York has long been settled and because the legislative history indicates no intention to change that meaning.

The phrase "under color of official right" traces its origin to a penal code prepared by David Dudley Field and others. Commissioners of the Code, The Penal Code of the State of New York (1865). Interestingly, the definition of extortion in that code is even closer to the one used in the 1934 Act, than is New York's 1909 version. The Field version provided:

"§ 613. Extortion is the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right."

In a note to that definition the Commissioners referred to an old New York case, *People v. Whaley*, 6 Cow. 661 (N.Y.

---

merce, it seems advisable to definitely exclude such legitimate activities.

As the typical racketeering activities affecting interstate commerce are those in connection with price fixing and economic extortion directed by professional gangsters, we have inserted subparagraphs (a) and (b), making such activities unlawful when accompanied by violence and affecting interstate commerce.

The Sherman Antitrust Act is too restricted in its terms and the penalties thereunder are too moderate to make that act an effective weapon in prosecuting racketeers. The anti-racketeering bill would extend the Federal jurisdiction in those cases where racketeering acts are related to interstate commerce and are therefore of concern to the Nation as a whole.

We have added a new provision prohibiting conspiracy as well as the substantive acts and we have also added a separability clause to make certain that the entire act will not be declared unconstitutional in the event that its application to any circumstance is held invalid.

We feel that this bill is a vital part of any Federal program to suppress so-called 'racketeering' activities which have assumed Nation-wide proportions.

Sincerely yours,

HOMER CUMMINGS,

Attorney General"

17. Penal Law of 1909, § 850, *as amended*, Laws of 1917, ch. 518, *reprinted in* N.Y. Penal Law, appendix § 850 (McKinney 1967).

654

Sup.Ct.1827), for the derivation of the "color of official right" language. *Whaley* involved a typical common law extortion. A suit had been commenced on a note. On the return date of the summons the plaintiff did not appear. After telling the defendant that he was going to tax the plaintiff with costs, the justice secretly adjourned the case. However, the defendant confessed judgment and paid the amount he owed on the note into the court. The justice collected a fee to which he was technically entitled only if a judgment had been entered. But the jury was permitted to find, and did, that the plaintiff's non-appearance had caused the case to be discontinued. Thus no judgment could have been entered since the discontinuance ousted the justice of jurisdiction. The fee had been collected "under color of official right." The court defined the offense thus:

> "Extortion signifies, in an enlarged sense, any oppression under color of right. In a stricter sense, it signifies the taking of money by any officer, by color of his office; either, where none at all is due, or not so much due, or when it is not yet due." *Id.* at 663.

The Field Code does not appear to have been adopted in its entirety. However, it served as a prototype for a new penal statute, the Penal Code of 1881. Laws of 1881, ch. 676. That enactment copied Field's definition of extortion verbatim. Section 552 of the Penal Code of 1881. But significantly, the 1881 Code expanded upon Field's enactments dealing with extortion. For § 556 of the 1881 enactment contains the marginal notation "extortion committed under color of official right," appended to a new section not found in the Field Code:

> " § 556. A public officer, or a person pretending to be such, who, unlawfully and maliciously, under pretense or color of official authority,
>
> 1. Arrests another, or detains him against his will; or
>
> 2. Seizes or levies upon another's property; or
>
> 3. Dispossesses another of any lands or tenements; or
>
> 4. Does any other act, whereby another person is injured in his person, property, or rights;
>
> Commits oppression and is guilty of misdemeanor."

Section 556 was carried forward to the Penal Code of 1909, being re-enacted verbatim as § 854.

An examination of the Penal Code of 1909 reveals something else that is noteworthy. Section 854 (formerly § 556 reprinted, *supra*) is captioned "Oppression committed under color of official right." It is clear that this title was not added by McKinney, since the caption previously read "Extortion committed under color of official right" but was amended in 1945 to substitute the word "oppression" for "extortion."

What does all this tell us? Certainly the New York statute did not contemplate a prosecution such as the one we are now reviewing. The New York statute intended to proscribe common law extortion which required an act or pretended act in an official capacity. Even if I were to accept the majority's approach, and conclude that Mazzei derived his *de facto* power solely from his position as state senator, his actions were not those of "[a] public officer, or a person pretending to be such [acting] . . . under pretense or color of official authority." Remembering that the common law term was "color of office" and not "color of official right," that the latter term had been known to American jurisprudence for some 70 years before the 1934 Act, and that the legislative history suggests no reason to interpret color of official right any differently from its historical meaning, it offends all sense of logic to think that the draftsmen chose this term of art by accident, or that they intended it to reach the offense committed by Mazzei.

Putting this all to one side, however, I come to the most disturbing feature of this case. If "color of official right"

does not mean common law extortion, what does it mean? Does it give fair warning of the conduct which it proscribes? Does it mean whatever the United States Attorney in a given district says it means? Does it cover payments to corporate officers or union officials [18] as well as to public officials? Unless we attribute to Congress the intention to use the term to describe the classic common law offense of extortion, which has a well-defined content, then I submit that the disjunctive clause in the statute is unconstitutionally vague. It simply gives no fair warning of the conduct it proscribes. It is one thing to hold, as we did in *United States v. Kenny, supra,* that Congress disjunctively prohibited both the not uncommon statutory type of extortion—use of threats—and the common law extortion—abuse of office. It is quite another to cut the disjunctive clause loose from the anchor of the common law and set it adrift upon a sea of prosecutorial discretion.

In recent years the government has espoused a startling broad view as to what conduct is proscribed by the Hobbs Act. In *United States v. Meyers,* 395 F.Supp. 1067 (E.D.Ill.1975), for example, it urged that a non-incumbent candidate who elicited a pre-election payoff to award contracts to the payor after election fell within the statute. The district court rejected this contention; rightly so, I suggest. Yet the *Meyers* case is closer to common law extortion than is this case, for the payment was made in connection with the performance of duties of the office to which the candidate aspired. If the charge under which this case was submitted to the jury is correct, *Meyers* is an *a fortiori* case. I ask, however, whether anyone reading this 1934 statute aimed primarily at labor racketeering would have anticipated that it regulated state election compaign financing. To me, at least, it does not give fair warning to that effect.

## V. Conclusion

The Supreme Court has recently reiterated that an "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971); *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). This rule of narrow construction is rooted in the belief that due process requires that fair warning should be given as to what conduct may be subject to the sanctions of the criminal law. *See United States v. Bass, supra,* at 348, 92 S.Ct. 515, 30 L.Ed.2d 488; *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95–96, 5 L.Ed. 37 (1820). Otherwise far too much discretion will be placed in the hands of executive branch enforcement officials, and it will inevitably be abused. In the present climate of mistrust of persons in public life—a mistrust that unfortunately cannot be said to be undeserved—it is tempting to hold that since what Senator Mazzei did was reprehensible he ought to be punished by some authority, and to stretch the Hobbs Act to meet the occa-

---

18. *Cf. Bianchi v. United States,* 219 F.2d 182, 193–94 (8th Cir.), *cert. denied,* 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955):

"Defendants complain that under the instructions given the jury could find defendants guilty if they obtained money under color of office as union representatives. Defendants are referring to the common law offense of extortion where, in case of public officers, color of office takes the place of force, threats, and pressure. No one contends that defendants are liable merely because they are union officials, and obtained the money. As to this contention the trial court in ruling on motion for a new trial said:

'The only time such terms have come into this case they were injected by the defendants. They appear once in the charge and then at defendants' request and in a negative way. Defendants requested and the Court gave their request number 54. It reads:

'If a Union officer accepts money or property as a private individual and not in his official capacity there can be no finding of extortion under color of office however inconsistent with official duty may be the acceptance of such money or property.'

The Defendants are not in a position to object to an instruction given at their request."

sion. Courts must resist that temptation in the interest of the long-range preservation of limited and even-handed government. If in the guise of regulating interstate commerce Congress wants to prohibit influence peddling for hire in state and local government it should be far more specific than in § 1951(b)(2). I would read no more into the clause "under color of official right" than the common law definition of extortion. This record does not establish common law extortion and neither the court's charge nor the majority's description of the facts define it. I would reverse the conviction.