**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-3023, 13-3025, 13-3478
_____

UNITED STATES OF AMERICA

v.

PATRICIA FOUNTAIN,
　　　　　Appellant in 13-3023

CALVIN JOHNSON, JR.,
　　　　　Appellant in 13-3025

and LARRY ISHMAEL,
　　　　　Appellant in 13-3478
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-cr-00155-001, 2-12-cr-00155-002 and
2-12-cr-00155-003, )
District Judge:  Honorable Stewart Dalzell
_____

Argued: December 10, 2014

Before:  FUENTES, FISHER, and KRAUSE, *Circuit Judges.*

(Opinion Filed: July 10, 2015)

_____

JOSEPH J. KHAN (Argued)
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee United States of America*

RICHARD COUGHLIN
JULIE A. MCGRAIN (Argued)
Office of Federal Public Defender
800-840 Cooper Street
Suite 350
Camden, NJ 08102

*Counsel for Appellant Patricia Fountain*

LAWRENCE J. BOZZELLI (Argued)
Suite 701
211 North 13th Street
Philadelphia, PA 19107

*Counsel for Appellant Calvin Johnson, Jr.*

DANIEL I. SIEGEL (Argued)
Office of Federal Public Defender
800 King Street
Suite 200
Wilmington, DE 19801

---

OPINION OF THE COURT

---

KRAUSE, *Circuit Judge*.

This is a consolidated criminal appeal, arising out of a large tax fraud conspiracy, that presents us with an opportunity to clarify the mental states required of the payor and payee to uphold a conviction for Hobbs Act extortion under color of official right. For the reasons set forth below, we will affirm.[1]

## I. Background

Between 2007 and 2012, Appellant Patricia Fountain, an IRS employee, helped orchestrate several schemes to fraudulently obtain cash refunds from the IRS. Those schemes involved filing false tax returns that claimed refunds pursuant to the Telephone Excise Tax Refund ("TETR"), the First Time Home Buyer Credit ("FTHBC"), or the American Opportunity Tax Credit ("AOTC"). Fountain employed her knowledge of the IRS's fraud detection procedures to avoid suspicion, including that TETR claims below $1,500 would not be flagged for review. Over time, Fountain and her significant other, Appellant Larry Ishmael, enlisted various people, including Appellant Calvin Johnson, Jr., to recruit

---

[1] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

claimants who would provide their personal information in exchange for a portion of a cash refund. During the same period, Johnson became involved in an additional conspiracy with some of his family members and other acquaintances that involved submitting fraudulent FTHBC and AOTC claims.

After a two-week trial, a jury convicted Fountain, Ishmael, and Johnson on multiple counts of conspiracy and filing false claims to the IRS in violation of 18 U.S.C. §§ 286 and 287. Fountain was also convicted on one count of Hobbs Act Extortion and two counts of making or presenting false tax returns, violations of 18 U.S.C. § 1951(a) and 26 U.S.C. § 7206, respectively. Additionally, Johnson was convicted of filing false claims to the IRS while on pretrial release in violation of 18 U.S.C. §§ 287 and 3147(1).

Fountain moved for a judgment of acquittal after trial on the Hobbs Act charge, which the District Court denied. Following evidentiary hearings on the dollar amounts involved in the Defendants' schemes, the District Court sentenced Fountain to 228 months' imprisonment and a three-year term of supervised release, and ordered her to pay restitution of $1,740,221.40. The District Court sentenced Ishmael to 144 months' imprisonment and a three-year term of supervised release, and ordered him to pay restitution of $1,751,809.40. Finally, the District Court sentenced Johnson to 216 months' imprisonment and a three-year term of supervised release, and ordered him to pay restitution of $1,248,392.40. Each of these sentences fell within the applicable Guidelines ranges after the District Judge imposed various enhancements.

## II.    Discussion

### A.	Fountain's Hobbs Act Conviction

Fountain contends that the evidence at trial was insufficient to support a conviction for extortion under color of official right.  While sufficiency of the evidence is a question of law subject to plenary review, "[w]e review 'the evidence in the light most favorable to the Government,' afford 'deference to a jury's findings,' and draw 'all reasonable inferences in favor of the jury verdict.'"  *United States v. Moyer*, 674 F.3d 192, 206 (3d Cir. 2012) (quoting *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010)).  We will overturn the verdict "only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt."  *Id.* (quoting *Riley*, 621 F.3d at 329) (internal quotation marks omitted).

The extortion count against Fountain alleged that she obtained and attempted to obtain money from Deborah Alexander under color of official right as an IRS employee.  As the Government demonstrated at trial, Alexander was a client at Natashia Witherspoon's hair salon.  Witherspoon, who was also Fountain's hairstylist, recruited Alexander and other clients to provide personal information so that Fountain could file fraudulent tax returns in their names.  Witherspoon had Alexander fill out blank IRS forms with her personal information and then gave those forms to Fountain for her to file.  Alexander never dealt directly with Fountain, but she knew Fountain worked for the IRS.  Sometime after her tax return was filed, Witherspoon told her that she had to pay Fountain a $400 fee.  Alexander testified that she became suspicious, but paid the fee anyway.  Witherspoon testified that she told some people that Fountain would "red flag" them if they did not pay her fee, but did not say whether she conveyed that information to Alexander in particular.

5

Likewise, Alexander did not recall Witherspoon mentioning any consequences for failing to make the payment.

We hold that the evidence adduced at trial was sufficient to support Fountain's Hobbs Act conviction. Because we have articulated the appropriate standard for an official right extortion conviction in varying ways in past cases, we take this opportunity to synthesize our case law and explain how we come to this result.

### 1. Elements of Hobbs Act Extortion Under Color of Official Right

The federal statute penalizing extortion, 18 U.S.C. § 1951, a codification of the 1946 Hobbs Act, provides that:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2). As we explained in *United States v. Manzo*, 636 F.3d 56 (3d Cir. 2011):

Congress sought to proscribe coercive activity through enactment of the Hobbs Act. Under the terms of the Hobbs Act, a person can only commit extortion in one of two ways: (1) through threatened force, violence or fear or (2) under color of official right. *See* 18 U.S.C. § 1951(b)(2). Both of these types of extortion are inherently coercive.

*Id.* at 65.

Whereas in a case of extortion by force, violence, or fear, the acts or threats supply the coercion, "when proceeding under a 'color of official right' theory, the 'misuse of public office is said to supply the element of coercion.'" *Id.* (quoting *United States v. Hathaway*, 534 F.2d 386, 393 (1st Cir. 1976)); *see also Evans v. United States*, 504 U.S. 255, 266 (1992) (adopting the majority rule that "the coercive element" of Hobbs Act extortion under color of official right "is provided by the public office itself"). In other words, the importance of a defendant's public office or official act to a Hobbs Act charge is its coercive effect on the payor. Accordingly, after reviewing the legislative history and evaluating competing constructions of the statute, the Supreme Court held in *Evans* that to prove a conviction for extortion under color of official right, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." 504 U.S. at 268.

We interpreted *Evans* in *United States v. Antico*, 275 F.3d 245 (3d Cir. 2001), and explained that "no 'official act' .

7

. . need be proved to convict under the Hobbs Act." *Id.* at 257. Rather, we focus on (1) the motivation of the payor, that is, whether a payment "*was made* in return for official acts," and (2) whether the defendant knew the payor's motivation. *Id.* (emphasis added) (quoting *Evans*, 504 U.S. at 268) (internal quotation marks omitted). As such, in *Antico*, we approved a district court's instruction that the jury had to decide "whether the giver gave the payments . . . because <u>he believed</u> *the defendant would use his office for acts not properly related to his official duty*." *Id.* at 259 (underline added). Similarly, in *United States v. Urban*, 404 F.3d 754 (3d Cir. 2005), we upheld a Hobbs Act conviction where the government adduced substantial evidence that (1) the payors made payments to the defendants knowing they were "public officials exercising governmental authority"; (2) the payors "made payments in order to assure advantageous exercise of that government authority"; and (3) the defendants "knew that the [payors'] payments were made for an improper purpose, i.e., the influencing of their governmental authority." *Id.* at 769.

In other decisions, however, we have expressly identified another consideration in our official right extortion inquiry: whether the payor's belief was reasonable. This line of cases began with our en banc decision in *United States v. Mazzei*, 521 F.2d 639 (3d Cir. 1975) (en banc). There, the defendant, a state senator, received payments in exchange for helping a corporation obtain a lease from a state executive agency. *Id.* at 641. The defendant argued that he could not have been acting under color of official right because he "had no official power" in that area, and he "never pretended to have any official power." *Id.* at 643. We acknowledged that the "defendant had no statutory power as a state senator to

8

control the granting of leases by state executive agencies," but rejected the defendant's argument, because "in order to find that defendant acted 'under color of official right,' the jury need not have concluded that he had actual *de jure* power to secure grant of the lease so long as it found that [the payor] held, and defendant exploited, a reasonable belief that the state system so operated that the power in fact of defendant's office included the effective authority to determine recipients of the state leases here involved." *Id*.

We recently extended *Mazzei* in *United States v. Bencivengo*, 749 F.3d 205 (3d Cir. 2014). There, we upheld a Hobbs Act conviction of the Mayor of Hamilton Township, New Jersey, who accepted payments in exchange for agreeing to influence the awarding of School Board insurance contracts. *Id.* at 208. We noted that the defendant "had no actual *de jure* or *de facto* power over the award" of such contracts, and that unlike in *Mazzei*, there was no evidence "that [the payor] believed he had such power." *Id.* at 212. Nonetheless, we held that *Mazzei* extended to situations where a payor reasonably believed the defendant possessed "influence," if not "effective power," over an exercise of governmental authority. *Id.* at 212-13. Thus, we concluded, "where a public official has, and agrees to wield, influence over a governmental decision in exchange for financial gain, or where the official's position could permit such influence, and the victim of an extortion scheme reasonably *believes* that the public official wields such influence, that is sufficient to sustain a conviction under the Hobbs Act, regardless of whether the official holds any *de jure* or *de facto* power over the decision." *Id.*

Read together, our holdings in *Mazzei*, *Antico*, *Urban*, and *Bencivengo*, while emphasizing different aspects of the

9

payor's motivation, are consistent in accounting for the payor's reasonable belief as a reflection of the coercive effect of the defendant's official acts. The reason we included in our inquiry the reasonableness of the payor's belief that the defendant would engage in particular "official acts"— whether by exercising *de jure* power, *de facto* power, or "influence"—in *Mazzei* and *Bencivengo* but not *Antico* or *Urban* is simple: The defendant's authority to engage in the relevant "official acts" was not contested in *Antico* or *Urban*. Both of those cases involved Philadelphia Licenses and Inspections officers who accepted illicit payments in exchange for favorable exercises of their authority, i.e., they rewarded people who paid and punished people who did not. *See Urban*, 404 F.3d at 760-62; *Antico*, 275 F.3d at 249.[2] Those defendants clearly exercised *de jure* power over governmental decisions. In contrast, in *Mazzei* and *Bencivengo*, the defendants' authority *was* contested, as indicated above.[3] But in all of these cases, reasonableness was inherent in our inquiry.

Thus, our case law articulates a unified standard for official right extortion cases: We will uphold a conviction for Hobbs Act extortion where the evidence indicates (1) that the payor made a payment to the defendant because the payor held a reasonable belief that the defendant would perform official acts in return, and (2) that the defendant knew the payor made the payment because of that belief.

---

[2] One might refer to these as "classic" official right extortion cases.

[3] Fountain raises similar arguments here, as explored below.

10

## 2.      Application

Upon a careful consideration of the record, we agree with the District Court that a rational juror could conclude that Alexander paid Fountain $400 with the understanding that Fountain would use her position at the IRS to help her obtain a cash refund, and that Fountain knew that Alexander paid her for that reason.  While Fountain may not have had any power over the IRS's decision to grant any of the fraudulent refunds she filed, we need not find that Fountain actually used her position or performed an official act in furtherance of the scheme to uphold her conviction; the focus of our inquiry is on Alexander's state of mind.  *See Antico*, 275 F.3d at 257 ("In other words, no 'official act' (i.e., no 'quo') need be proved to convict under the Hobbs Act.  Nonetheless, the official must know that the payment—the 'quid'—was made in return for official acts."); *see also Urban*, 404 F.3d at 768 ("[T]he government need not prove . . . that the public official acted or refrained from acting as a result of payments made.").

Fountain contends both that Alexander did not subjectively believe and that no reasonable person in Alexander's position could have believed that Fountain, a customer service representative for the IRS, could influence whether she received a refund.  Viewing the evidence in the light most favorable to the Government, however, the evidence at trial allowed the jury to find that Alexander reasonably believed Fountain could wield such influence.  It is not clear exactly what Alexander understood about Fountain's position, as Alexander interacted only with Witherspoon, but as Alexander testified, once her refund claim was submitted, she was told she had to pay $400 of the refund to Fountain and, despite her suspicions, she acquiesced

11

because she was "still hoping to get the money." Fountain's App. 327. This suggests she understood her $400 payment to be compensation for services rendered. Indeed, when the IRS demanded repayment of the refund, Alexander told Fountain and Witherspoon, "I want my $400 back, because if I had to pay the $1,400 back [to the IRS], I'm not going to give her $400." Fountain's App. 318. On the basis of this evidence, the jury easily could have found that Alexander reasonably believed Fountain would help her obtain the refund.

The jury also could have found that Alexander reasonably feared reprisal. Alexander paid Fountain *after* her claim had been submitted and despite her suspicions about Fountain's demand for payment. Even though neither Alexander nor Witherspoon testified to any explicit discussion with Alexander about the consequences of failing to pay, Witherspoon did testify generally that Fountain threatened to "red flag" claimants who did not pay her fee and that she repeated Fountain's warning to claimants. Fountain's App. 265-66. Thus, a reasonable inference from the testimony, as well as the timing of the payment, is that Alexander paid Fountain because she was concerned that Fountain, as an IRS employee, otherwise would have prevented the refund or flagged it to a superior for suspected fraud.[4]

Finally, we reject Fountain's argument that the evidence in support of the Hobbs Act charge was insufficient because the Government failed to prove that she used the

---

[4] Indeed, the Government demonstrated that Fountain did submit amended returns for claimants who ultimately failed to pay, leading the IRS to reclaim some of the fraudulently-obtained refunds, including from Alexander.

12

power of her employment at the IRS to induce Alexander to pay her in exchange for filing a false claim with the IRS. Inducement is not an element of Hobbs Act extortion under color of official right. *Evans*, 504 U.S. at 256; *Urban*, 404 F.3d at 768; *Antico*, 275 F.3d at 256. Accordingly, we affirm Fountain's conviction.[5]

## B.     The District Court's Guidelines Determinations

Fountain, Ishmael, and Johnson each challenge the District Court's calculation of the applicable Guidelines range for their sentence. Where an objection is preserved at sentencing, we exercise plenary review of a district court's interpretation of the Guidelines but review its factual findings for clear error. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). If the facts underlying a Guidelines determination are not in dispute, "but the issue is whether the agreed-upon set of facts fit within the enhancement requirements," we review the District Court's application of the enhancement for clear error. *United States v. Fish*, 731 F.3d 277, 279 (3d Cir. 2013). Finally, where an objection is not preserved at sentencing, we review that challenge for plain error. *United States v. Couch*, 291 F.3d 251, 252-53 (3d Cir. 2002); *United States v. Knight*, 266 F.3d 203, 206 (3d Cir. 2001).

### 1.     Sophisticated Means Enhancements

---

[5] Because we conclude the evidence supports Fountain's conviction for the completed offense, we need not consider the Government's alternative contention that the evidence supported a conviction of attempted extortion.

### a.      Fountain and Johnson

Fountain and Johnson both argue that the District Court erred in applying a two-level enhancement for sophisticated means to their sentences under U.S.S.G. § 2B1.1 because there was nothing particularly sophisticated about the means employed in their schemes.  Their arguments are unpersuasive.

While the Application Notes to § 2B1.1 suggest that the use of "fictitious entities, corporate shells, or offshore financial accounts" would constitute sophisticated means,[6] an offense can easily warrant the sophisticated means enhancement absent the use of those tactics.  *See United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013)

---

[6] *See* U.S.S.G. § 2B1.1 cmt. n.9(B) ("'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."); *id.* § 2T1.1 cmt. n.5 (explaining similar factors for applying the sophisticated means enhancement for tax fraud offenses); *see also id.* § 2T1.1 cmt. background ("Although tax offenses always involve some planning, unusually sophisticated efforts to conceal the offense decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes.").

14

(upholding a sophisticated means enhancement in the absence of corporate shells or offshore accounts, and explaining that "the list contained in the application note is not exhaustive," and that "the enhancement properly applies to conduct less sophisticated than the list articulated in the application note"); *see also Fish*, 731 F.3d at 280 (holding that the existence of one of the facts listed in the application note is not necessary to a determination that an offense employed sophisticated means).

Determining whether a defendant employed sophisticated means can involve considering factors like the duration of a scheme, the number of participants, the use of multiple accounts, and efforts to avoid detection. *See Fish*, 731 F.3d at 280. Ultimately, a sophisticated means enhancement is appropriate where a defendant's conduct "shows a greater level of planning or concealment than a typical fraud of its kind." *United States v. Fumo*, 655 F.3d 288, 315 (3d Cir. 2011) (quoting *United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011)) (internal quotation mark omitted).

The enhancement was clearly appropriate here. Fountain identified IRS programs that would pay substantial sums and then designed a scheme to maximize her payout while avoiding detection. In finding that she employed sophisticated means, the District Court pointed specifically to Fountain's use of inside knowledge of the IRS's enforcement thresholds, including that TETR claims under $1,500 would not be flagged for review. Fountain took steps to conceal her identity even from others involved in the scheme, employing third parties to recruit claimants and collect their fees so she could avoid any contact with them. Additionally, Fountain developed an enforcement mechanism to ensure her fees were

15

paid: submitting amended returns that tipped off the IRS when claimants were reluctant to pay her. Fountain's choice to use the IRS as her enforcer further decreased the likelihood that claimants would report her, as they would fear prosecution themselves. In short, Fountain endowed the scheme with a sophisticated knowledge of IRS practices—including some not known to the public—and an elaborate plan for manipulating hundreds of people.

For his part, Johnson engaged recruiters to collect additional claimants and instituted additional practices to avoid detection. He routed refunds into accounts that would not raise alarms, like the business bank accounts of various relatives and the estate and personal accounts of his recently-deceased grandmother, and he used different business and personal addresses for the delivery and cashing of checks. Moreover, he electronically filed claims in such a manner that they could be traced only to a third party's wireless network, rather than his own.

Overall, the sophisticated means employed by Fountain, Johnson, and their co-conspirators (including Ishmael) allowed the scheme to grow to an extraordinary size while remaining undetected for years. Their cunning and willingness to abuse Fountain's position with the IRS clearly set this scheme apart from a "typical fraud of its kind." *See Fumo*, 655 F.3d at 315. Their conduct led the District Judge to remark, at Johnson's sentencing, that "this was as sophisticated a tax fraud scheme as this Judge has seen in 22 years." Gov't's Supplemental App. 74. In light of these findings, the application of sophisticated means enhancements to Fountain and Ishmael was not clear error.

### b. Ishmael

16

In the District Court, Ishmael challenged the sophisticated means enhancement to his sentence on the same grounds that Fountain and Johnson did: that the scheme, as a whole, did not involve sophisticated means. Ishmael does not raise that argument on appeal. Instead, he argues that the District Court committed procedural error under U.S.S.G. § 1B1.3(a)(1)(B). He points to the District Court's statement during his sentencing hearing that the fraud scheme "was only possible because of the sophisticated means that, to be sure, were made possible by Ms. Fountain, not Mr. Ishmael." Ishmael's App. 151. Ishmael contends that this statement indicates that the District Court attributed Fountain's sophisticated means to Ishmael and that it erred by doing so without finding that Fountain's use of those means was reasonably foreseeable to Ishmael. He asks us to remand for resentencing so the District Court can make this finding.[7]

Ishmael argues that our decision in *United States v. Collado*, 975 F.2d 985 (3d Cir. 1992), compels us to remand for the District Court to make a finding of reasonable

---

[7] Because Ishmael did not raise this objection in the District Court, the Government argues that we should apply plain error review. Ishmael counters that our decision in *United States v. Flores-Mejia*, 759 F.3d 253 (3d Cir. 2014) (en banc), does not apply retroactively, and, accordingly, that we should review for an abuse of discretion. We conclude that Ishmael's challenge fails even if we do review for an abuse of discretion, and we thus need not decide whether his challenge should be subject to plain error review.

17

foreseeability.[8]  To the contrary, *Collado* indicates that we may conduct our own review of the record to see if it supports a finding of reasonable foreseeability.  *See Collado*, 975 F.2d at 997.  If we are convinced that the attribution of Fountain's sophisticated means is firmly supported by the record, there is "no reason to remand this case only to have the district court reach the same sentencing decision." *United States v. Duliga*, 204 F.3d 97, 101 n.2 (3d Cir. 2000).

Here, it is clear that the sophisticated means Fountain employed were reasonably foreseeable to Ishmael.  Fountain and Ishmael lived together and had children together.  The evidence established that Ishmael knew about the IRS's $1,500 threshold for flagging TETR claims for review, and that he knew that Fountain would reverse claimants' refunds if they did not pay her fee.  Moreover, the District Court found that Ishmael was "the engine that drove [the] conspiracy from one that might have involved a handful of phony tax refunds to one that involved hundreds at a cost of over $2 million to the United States treasury," and that Ishmael's leadership "succeeded in spreading [the] scheme like wild fire." Ishmael's App. 163.  Thus, we are convinced that a finding of reasonable foreseeability is firmly supported

---

[8] Although *Collado* dealt with the inclusion of drug quantities dealt by co-conspirators in a defendant's base offense level calculation, also known as "accomplice attribution," rather than a sophisticated means enhancement, the same "reasonably foreseeable" standard applies to each inquiry, as both are guided by § 1B1.3. *See United States v. Anobah*, 734 F.3d 733, 739 (7th Cir. 2013); *United States v. Crosgrove*, 637 F.3d 646, 666 (6th Cir. 2011).

by the record, and we affirm the District Court's application of the sophisticated means enhancement to Ishmael.

### 2. Fountain's Enhancement for Using a Minor

Fountain argues that the District Court erred in applying a two-level enhancement for using a minor to commit her offenses under U.S.S.G. § 3B1.4. The evidence established, however, that Fountain used her minor daughter to collect payments that had been given to Witherspoon on at least one occasion. Fountain counters that her use of her daughter cannot support the enhancement because by the time she had her daughter collect payments, the crime was complete, as Fountain had already filed the false returns.[9] But the focus of a court's inquiry under § 3B1.4 "is on the actions and intent of the defendant. Whether the minor himself engaged in any criminal actions, whether the minor intended to assist in the adult's criminal activity, or whether the minor even knew that the adult was involved in criminal activity are factors irrelevant to application of the § 3B1.4 enhancement." *United States v. Gaskin*, 364 F.3d 438, 464-65 (2d Cir. 2004) (collecting cases). Moreover, the crime continued after the filing of returns, as collecting payment, which occurred after filing, was the whole point of the scheme. Further, the evidence indicates that Fountain and her co-conspirators continued filing false returns after Fountain

---

[9] The Government notes that Fountain did not raise this argument in the District Court, and argues that it should be reviewed for plain error as a result. Because we conclude that the District Court committed no error in applying the enhancement, we need not decide which standard applies.

had her daughter pick up payments from Witherspoon. Thus, the imposition of this enhancement was not clear error.

### 3. Johnson's Leadership Role Enhancement

Johnson argues that the District Court erred in applying a four-level enhancement under U.S.S.G. § 3B1.1(a) because the record lacks evidence that Johnson was a leader or organizer. To support this enhancement, the evidence must show that Johnson exercised some degree of control over at least one other person involved in the offense. *United States v. Helbling*, 209 F.3d 226, 243-44 (3d Cir. 2000). The evidence indicated that Johnson recruited his father and a friend named Andre Bruce to participate in the AOTC and FTHBC schemes, and that Johnson's father eventually became a recruiter for Johnson and would withdraw money for him after the IRS issued refunds. Johnson also directed Bruce to destroy evidence while Johnson was on pre-trial release. Thus, the District Court did not clearly err in imposing this enhancement.

### 4. Johnson's Loss Calculation

Johnson also argues that in calculating the loss attributable to him, the District Court improperly included losses that overstate his criminal conduct and were not reasonably foreseeable to him. It is well-settled that a sentencing court need only make a "reasonable estimate" of loss that is based on the available evidence in the record, *United States v. Tupone*, 442 F.3d 145, 156 (3d Cir. 2006), and it is clear the District Court did so here.

Johnson's arguments fail upon a review of the Government's loss methodology, which the District Court approved when it adopted the most conservative of the Government's proposed loss calculations. Johnson argues that the District Court erred by attributing all fraudulent tax returns to him, but the District Court did not do so. In fact, the Government did not ask the District Judge to do so. Along the same lines, Johnson argues he was improperly held responsible for returns filed from Fountain's IRS computer and for claims filed before he joined the conspiracy or after he left. The Government, however, excluded those amounts from its calculations. Further, Johnson argues that Bruce, not he, was responsible for returns filed from Bruce's IP address. But the District Court and the jury already rejected this argument based on Bruce's trial testimony. Thus, attributing those amounts to Johnson at sentencing was not clear error.

Finally, Johnson argues that the District Court improperly attributed to Johnson losses from the TETR and FTHBC conspiracies that were not reasonably foreseeable to him. In light of Johnson's role in recruiting claimants and allowing the use of his address and bank account in the TETR scheme and his leadership in the FTHBC scheme, the District Judge's inclusion of those amounts as reasonably foreseeable losses was not clear error.

In sum, the District Court arrived at a reasonable estimate of the loss amount attributable to Johnson by adopting the Government's conservative calculation. As such, we will not disturb the District Court's findings on appeal.

### C. Reasonableness of Fountain and Johnson's Sentences

Fountain and Johnson both argue that their sentences were procedurally and substantively unreasonable. We review a criminal sentence for an abuse of discretion and proceed in two stages. *United States v. Wright*, 642 F.3d 148, 152 (3d Cir. 2011). First, we review for procedural error, including failure to give meaningful consideration to a defendant's arguments or the factors listed in 18 U.S.C. § 3553(a). *Id.* Second, if there is no such error, we review for substantive reasonableness, and "we will affirm [the sentence] unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Id.* (alteration in original) (quoting *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc)) (internal quotation marks omitted). Sentences that fall within the applicable Guidelines range are more likely to be reasonable than those that do not. *United States v. Woronowicz*, 744 F.3d 848, 852 (3d Cir. 2014).

### 1. Fountain's Sentence

Fountain contends the District Court committed procedural error by placing undue weight on the Guidelines and on deterrence interests while minimizing the offender-specific considerations in this case, including that she was a first-time offender and the sole caregiver of four children, one of whom received a terminal medical diagnosis during the course of this prosecution. But the District Court gave adequate consideration to all of these factors, finding they were not "sufficiently extraordinary" to warrant a variance, and noted that they did not deter Fountain from her "egregious and protracted criminality." Fountain's App. 1008-09.

22

Fountain's argument ultimately amounts to a challenge of substantive unreasonableness, as a complaint that a district court's choice of sentence did not afford certain factors enough weight "is a substantive complaint, not a procedural one." *United States v. Merced*, 603 F.3d 203, 217 (3d Cir. 2010); *see also United States v. Bungar*, 478 F.3d 540, 546 (3d Cir. 2007) ("Nor do we find that a district court's failure to give mitigating factors the weight a defendant contends they deserve renders the sentence unreasonable."). As such, notwithstanding the tragic circumstances facing Fountain's family, Fountain cannot meet her heavy burden of showing that a sentence within the applicable Guidelines range was substantively unreasonable in light of the sophisticated nature of her crimes, her lack of remorse, her abuse of her position with the IRS, and the need to deter other public employees from taking advantage of sensitive information.

## 2. Johnson's Sentence

Johnson argues the District Court committed procedural error by cutting off his counsel's arguments at his sentencing hearing. But the District Judge merely declined to allow Johnson's attorney to cite an additional case in support of his sophisticated means objection. The District Judge only did so, moreover, after noting that all of Johnson's objections had been briefed ad nauseam. Thus, we find no abuse of discretion in that decision. Johnson also contends the District Court erred in treating a sentence within the applicable Guidelines range as presumptively correct, and by failing to address some of Johnson's arguments at sentencing. This contention, however, ignores the protracted exchange between the District Judge and Johnson's counsel on the question of whether to grant a departure or variance. The District Court also heard allocution from Johnson himself.

23

On the whole, Johnson cannot show the District Court failed to give meaningful consideration to any of his arguments or any sentencing factor, nor can he show any other procedural error.

Finally, given the District Court's findings that Johnson grew from a relatively small player in the TETR scheme to a major player in the conspiracy associated with the FTHBC and the AOTC, that he continued to commit offenses while he was on pretrial release, and that he failed to appreciate the magnitude of his crimes, Johnson cannot show that a sentence within the applicable Guidelines range was substantively unreasonable.

## III.  Conclusion

For the reasons stated above, we affirm the judgment of the District Court.