PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-3207
_____

UNITED STATES OF AMERICA

v.

ROHAN LYTTLE
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:21-cr-00026-002)
District Judge: Honorable Christopher C. Conner
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
February 6, 2026

Before: HARDIMAN, MONTGOMERY-REEVES, and ROTH,
Circuit Judges

(Filed: March 16, 2026)

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Rohan Lyttle, a native of Jamaica residing in New York, managed a scam that defrauded at least eight elderly victims. It was a family affair that included Lyttle's ex-wife, Caron Pitter, his son, Rohan Lyttle, Jr., and his former paramour and Junior's mother, Charlene Marshall. After Lyttle was convicted on all counts charged against him, he filed this appeal. Unpersuaded by any of Lyttle's arguments, we will affirm his judgment.

I

Lyttle was charged with conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. § 1349 (Count 1); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 5 and 6); wire fraud, in violation of 18 U.S.C. § 1343 (Count 7); transportation of goods taken by fraud, in violation of 18 U.S.C. § 2314 (Count 8); and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h) (Count 9). After a nine-day jury trial, he was convicted on all counts.

The scheme was facilitated by several businesses Lyttle owned in Queens, New York and Kingston, Jamaica. Lyttle and Pitter operated Ro-Cars Auto, an auto body shop, in New York. Lyttle also had ties to RWR Collision, a towing company, and Work Hard Motors, an entity that was used to purchase salvaged vehicles. Meanwhile, Junior and Marshall operated Rolcam Company Limited, a used car dealership, in Jamaica. Ro-Cars purchased vehicles in New York and fixed them up before shipping them to Jamaica for resale by Rolcam.

The evidence at trial established that these businesses were used to launder money acquired through an advance-fee

2

lottery scam that targeted elderly Americans. The scam revolved around an unidentified individual posing as "Andrew Goldberg," the former CEO of Publishers Clearing House. "Goldberg" contacted seniors, falsely claiming that they had won large sums in a Publishers Clearing House sweepstakes. But there was a catch: to receive their "prize money," the victims were told they had to prepay certain taxes and fees.

Victims withdrew large sums of money from bank accounts, insurance policies, and retirement plans to obtain their "prize money." "Goldberg" instructed victims to mail cash, wire money, or even purchase and ship car parts to the Defendants' homes and businesses in New York. After a report from a victim's family brought the scam to the attention of law enforcement, the United States Postal Inspection Service identified a network of individuals who had sent and received packages at the direction of "Goldberg." Lyttle, Marshall, Pitter, and Junior were indicted. The first three were tried and convicted; Junior remains a fugitive.

One of the victims, Thomas Trouton, testified that "Goldberg" informed him he had won prize money and a Range Rover. Before receiving the vehicle, "Goldberg" instructed Trouton to purchase and mail thousands of dollars of parts that the vehicle needed for repairs. Trouton purchased over $15,000 in parts in two separate credit card transactions at a Range Rover dealership in Harrisburg, Pennsylvania. His understanding was that the parts were "supposed to be sent to Ro-Cars Auto in New York [for repair] and that Land Rover would arrange for pickup and delivery" of his car. App. II 198. Days after making the purchases, Trouton called Ro-Cars in New York to confirm they had received the shipment. He spoke to someone there who told him that the parts had been received. Trouton had also mailed packages containing

3

thousands of dollars in cash to addresses associated with Lyttle and his co-Defendants, including Marshall's residence (though the package was addressed to Pitter) and Ro-Cars's address in New York. Trouton never received a Range Rover.

The evidence showed that Lyttle received hundreds of thousands of dollars from the victims. At the direction of "Goldberg," multiple shipments (typically bundles of cash) were sent to several of the Defendants' homes and businesses in New York. For example, in 2017, another elderly victim, a South Carolina resident with no connection to Ro-Cars, wired approximately $16,500 to its business bank account. In 2020—at the height of the Defendants' involvement in the scam—another out-of-state victim mailed several packages of cash to Ro-Cars.

After the cash arrived, Lyttle, Pitter, or Marshall would launder that money through either personal bank accounts or business accounts related to Lyttle's entities. For instance, Pitter and Marshall regularly made bulk cash deposits (often immediately after a package was delivered) into different bank accounts. They would structure the transactions in small increments by making multiple cash deposits at different ATMs on the same day. A litigation finance expert testified that, from 2019 to 2020, Pitter's transactions alone totaled over $300,000, consisting mostly of ATM cash deposits and the purchase of cashier's checks.

In addition, a forensic examination of a desktop computer from Ro-Cars's office showed that, on or about January 24, 2020, a series of YouTube videos about Jamaican lottery scams were viewed on the device. An email account in the name of David Hunt was signed into the computer. Evidence at trial showed that Lyttle had used the pseudonym

4

"David Hunt" in the past. One of these videos was a short clip from a 2013 news report about Jamaica-based advance-fee lottery scams.

Before trial, all Defendants moved to exclude the video from evidence. They argued that the video was irrelevant and, alternatively, that it should be excluded because its prejudicial effect substantially outweighed any probative value under Rule 403 of the Federal Rules of Evidence. The District Court entered a small portion of the video into evidence as Exhibit 220 only to show "Lyttle's purported knowledge of its contents and intent to undertake a fraudulent scheme himself." App. I 40–41. The entire video was nearly seven minutes long, but the Court permitted only a 63-second portion that discussed Jamaica-based advance-fee lottery scams generally, including that those scams often target the elderly. The Court also gave a limiting instruction, emphasizing that the evidence was "admitted only to show that whoever accessed the video may have had the knowledge of or familiarity with a lottery scam." App. II 655. It directed jurors not to "use the YouTube video as evidence of wrongdoing itself or for the truth of the matter asserted in the video." App. II 655.

Along with Exhibit 220, Lyttle and his co-Defendants also objected to the admission of Exhibit 369. That exhibit was a summary of the Ro-Cars office computer's browser history, which included the names of three other videos related to different types of scams. The Defendants argued that the exhibit was neither relevant nor admissible under Rule 403. Again, the Court disagreed.

According to the District Court, Exhibit 369 was relevant because "it [went] to knowledge, state of mind, [and] control." App. II 684. The Court explained that the exhibit

5

"place[d] in context the individual who logged in as David Hunt[]" and "what was viewed" by that person. *Id.* The Court was not concerned by the evidence's alleged prejudicial effect: "[t]he videos that are identified are not going to be shown" and the jury had "already seen the [video] that is most poignantly relevant to the facts of this case," Exhibit 220. *Id.* So the District Court overruled the objection.

At the close of the Government's case-in-chief, Lyttle moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Lyttle's objection was vague. He "believe[d] the evidence [was] insufficient to establish guilt beyond a reasonable doubt of the charged offenses," but offered no reasons why the District Court should grant the motion. App. II 1494. Nor did he point to any elements of the charged offenses for which the evidence was purportedly insufficient. In denying Lyttle's motion, the Court detailed why, in its view, there was sufficient evidence to support a conviction on each count of the indictment.

As for Count 7 (wire fraud), the District Court noted that the parties had stipulated that Trouton's two credit card purchases were wire transactions under 18 U.S.C. § 1343. The Court reasoned that "the jury could conclude that Mr. Lyttle was aware of Andrew Goldberg's directions to Mr. Trouton and acted in furtherance of [the] wire fraud by receiving the auto parts." App. II 1508. Because Lyttle accepted over $15,000 of luxury vehicle parts from Trouton—an out-of-state resident who had never been a customer of his shop—the Court determined that there was sufficient evidence to support the guilty verdict on Count 7. Lyttle did not argue that Trouton's use of a credit card (rather than cash) was not reasonably foreseeable—the argument he now raises on appeal—at any point before, during, or after the trial. The District Court—

6

despite walking through each count and its reasons why the evidence was sufficient to sustain a conviction on each—thus did not have an opportunity to address the argument Lyttle raises now.

After the jury rendered its guilty verdict on all counts, the District Court sentenced Lyttle to 97 months' imprisonment, followed by a 3-year term of supervised release. It also ordered Lyttle to pay restitution in the amount of $245,148. At sentencing, the District Court applied a three-level enhancement under § 3B1.1(b) of the United States Sentencing Guidelines for Lyttle's role as a "manager or supervisor" of five or more participants in the criminal activity. He noted that there were at least five participants—the four indicted (Lyttle, Junior, Marshall, and Pitter) along with the unidentified individual posing as "Goldberg."

Lyttle owned and operated Ro-Cars Auto (and its related entities) alongside his co-Defendants. According to the District Court, the evidence at trial established that Lyttle had educated Pitter, Marshall, and Junior on "the purpose of each business entity and how they should operate each business to maximize cash flow and profits." S. App. 21. Lyttle also "carefully delegated tasks and authority for his business entities to perpetuate the fraud." *Id.* The Court concluded that "Lyttle was a manager or supervisor in the offense conduct" because, even though "Goldberg" was the putative ringleader of the scheme, Lyttle "was [an] individual who directed others to undertake activity in furtherance of the frauds that are the subject of the offenses of conviction." S. App. 23. For example, Lyttle allowed Pitter to sign for cash packages at Ro-Cars and "enabled [] Pitter and [] Marshall to launder victims' funds by moving money between bank accounts and by purchasing cashier's checks and used cars for his business." S. App. 21.

Lyttle appeals his judgment of conviction and his sentence, arguing that: (1) the District Court erred in denying his Rule 29 motion; (2) the Court erroneously applied a managerial enhancement to his sentence under Guidelines § 3B1.1(b); and (3) the Court abused its discretion by admitting two exhibits into evidence in violation of Rules 401 and 403 of the Federal Rules of Evidence.

II[1]

Lyttle first contends that the evidence was insufficient to maintain his wire fraud conviction on Count 7 under 18 U.S.C. § 1343. He argues it was not reasonably foreseeable that Trouton, one of his victims, would use a credit card to purchase auto parts in Pennsylvania and mail them to Ro-Cars in New York. Lyttle maintains that he could not have reasonably foreseen Trouton's use of a credit card to make the purchases because "Goldberg" routinely instructed victims to pay in cash, Lyttle ran a mostly cash business, and "the order form Goldberg sent to Mr. Trouton indicated that the terms of payment were to be cash." Lyttle Br. 6.

Lyttle never made that argument in the District Court, so we review it now for plain error. *See United States v. Abrams*, 165 F.4th 784, 801 (3d Cir. 2026); *United States v. Williams*, 974 F.3d 320, 361 (3d Cir. 2020). When Lyttle moved for acquittal on this count under Rule 29, he raised only a general objection, invoking Rule 29 without providing any specific argument to support it:

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(A).

> If it pleases the court, we likewise make a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure because we believe the evidence is insufficient to establish guilt beyond a reasonable doubt of the charged offenses in the indictment against Mr. Lyttle.

App. II 1494.

This vague objection mentioned neither which count(s) of the indictment it related to nor any specific reasons why the District Court should have granted the motion. So Lyttle did not preserve the argument he now raises on appeal. *See Abrams*, 165 F.4th at 801. But even had he done so, we detect no error—much less plain error—in the District Court's denial of the Rule 29 motion.

To prove wire fraud, the Government had to show: "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud[;] (2) with the specific intent to defraud[;] and (3) the use of interstate wire communications in furtherance of the scheme." *United States v. Andrews*, 681 F.3d 509, 528 (3d Cir. 2012) (citation modified). If the defendant should "reasonably have foreseen" use of the interstate wire communication, the defendant will be deemed to have used "interstate wires" within the meaning of the statute—even if he did not personally send the wire or instruct someone else to do so. *United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994).

When a defendant argues that the evidence was insufficient to support a jury verdict, "[w]e must view the evidence in the light most favorable to the government and must sustain [the] jury's verdict if 'a reasonable jury believing the government's evidence could find beyond a reasonable

9

doubt that the government proved all the elements of the offense.'" *United States v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001) (citation omitted). "[O]nly when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997) (citation modified).

Here, viewing the evidence in the light most favorable to the Government, we hold that a rational jury could have concluded that the wire in question was reasonably foreseeable. There is ample evidence in the record that Lyttle accepted delivery of the auto parts Trouton purchased in Pennsylvania and that the Range Rover promised to Trouton was ultimately repaired and shipped to Jamaica. So Lyttle had knowledge of the purchases. And regardless of "Goldberg's" purported preference for cash or Ro-Cars's status as a cash-based business, the record also supports the conclusion that Lyttle should have reasonably foreseen that a purchaser of over $15,000 in auto parts might use a credit card to purchase them. This is especially true given that large purchases are typically made through electronic forms of payment.

III

Lyttle also argues that the District Court erred at sentencing by imposing a three-level offense enhancement under § 3B1.1(b) of the Sentencing Guidelines because he was a manager or supervisor of criminal activity involving five or more participants. Lyttle acknowledged that he was the supervisor of his businesses' legitimate activity but argued that there was no evidence he supervised the *criminal activity* charged in the indictment.

10

Because the "interpretation of the [Guidelines] is a legal question," and Lyttle preserved this argument by raising it at sentencing, we exercise plenary review over the meaning of § 3B1.1(b). *United States v. Nasir*, 17 F.4th 459, 468 (3d Cir. 2021) (en banc). But we review the District Court's factual findings for clear error. *See United States v. DeGovanni*, 104 F.3d 43, 44 (3d Cir. 1997).

The question here is whether the District Court correctly determined that Lyttle was a "manager or supervisor" of the criminal activity. *See DeGovanni*, 104 F.3d at 46 ("[A] defendant's role *in the criminal activity* is the operative issue" for purposes of § 3B1.1). We hold it did.

A "manager or supervisor" within the meaning of Guidelines § 3B1.1 is someone who "exercise[s] some degree of control over" others involved in the offense. *United States v. Raia*, 993 F.3d 185, 192 (3d Cir. 2021) (quoting *United States v. Fountain*, 792 F.3d 310, 321 (3d Cir. 2015)). In *United States v. Adair*, we addressed § 3B1.1(a), which provides for a four-level increase if the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." 38 F.4th 341, 347–55 (3d Cir. 2022). We reasoned that, because § 3B1.1's structure provided greater penalties for "organizers" and "leaders" than the "managers" and "supervisors" in subsection (b), "organizers" and "leaders" must have "greater culpability than managers or supervisors." *Adair*, 38 F.4th at 352. After assessing the ordinary meaning of the text in context with the provision's structure, purpose, and history, we concluded that "an 'organizer' is a person who generates a coherent functional structure for coordinated criminal activity" and "a 'leader' is a person with high-level directive power or influence over criminal activity." *Id.* at 354. Relying on contemporary

11

definitions, we noted in dicta that the terms "manager" and "supervisor" referred to "a person with oversight over operations or other persons." *Id.* at 352 nn.16–17. We agree that "manager" or "supervisor" is a step down from "organizer or leader," so the individual who receives the § 3B1.1(b) enhancement will often be a mid-level member of a criminal group with at least "*some* degree of control." *Raia*, 993 F.3d at 192 (emphasis added).

The District Court made several relevant factual findings in applying this managerial sentencing enhancement. The Court noted that video evidence established that Lyttle educated Pitter, Marshall, and Junior on "the purpose of each business entity and how they should operate each business to maximize cash flow and profits." S. App. 21. It also found that Lyttle "carefully delegated tasks and authority" for his businesses to each of his co-Defendants to "perpetuate the fraud." *Id.* Perceiving no clear error in those factual determinations, we agree that Lyttle exercised a degree of control and oversight over Pitter, Marshall, and Junior in the money laundering operation that led to their indictment and conviction. Because the District Court properly interpreted and applied § 3B1.1(b), Lyttle's sentencing argument fails.

Our decision does not mean that any time a defendant is the manager or supervisor of a legitimate business and is subsequently charged in relation to activities related to the business that he will necessarily be a "manager or supervisor" within the meaning of § 3B1.1(b). We hold only that the evidence here showed Lyttle managed and supervised the charged criminal activity (money laundering). So the enhancement applied.

12

IV

Finally, Lyttle contends that the District Court violated Rule 403 of the Federal Rules of Evidence when it admitted Exhibits 220 and 369 into evidence. We review the District Court's evidentiary rulings for abuse of discretion, *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010), and construe that discretion "especially broadly" in the Rule 403 context, *United States v. Scarfo*, 41 F.4th 136, 178 n.35 (3d Cir. 2022). "When a court engages in a Rule 403 balancing and articulates on the record a rational explanation, we will rarely disturb its ruling." *United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992).

Exhibit 220 is a 2013 news clip discussing Jamaica-based lottery scams targeting elderly Americans. It was viewed by someone in the Ro-Cars office signed in as "David Hunt" in January 2020. Lyttle argues that the portions of the video shown to the jury were "designed to elicit strong emotional responses" because the report focused on elderly Americans as victims of Jamaica-based scammers and the chyron included the phrase "Cruel Fraud." Lyttle Br. 25.

We do not agree with Lyttle that the video's probative value—to show that the person who viewed this video may have known how these types of scams generally worked—was substantially outweighed by any of the concerns addressed by Rule 403. *See* Fed. R. Evid. 403. Lyttle had used the alias "David Hunt" in the past and he had access to the computer. Moreover, the video would imbue the person viewing it with knowledge of advance-fee lottery scams.

The District Court also gave a proper limiting instruction. The Court instructed jurors to consider the video

only to determine whether the individual who viewed it was generally familiar with this type of scam, not as evidence of wrongdoing. The Court also curtailed the scope of the video that was played to the jury. Far from abusing its discretion, it "reasonably assessed the video['s] relevance and probative value and took appropriate steps to mitigate [its] prejudicial impact." *United States v. Duka*, 671 F.3d 329, 351 (3d Cir. 2011); *see also id.* at 352 (holding that the district court did not abuse its discretion when it entered violent jihadist training videos into evidence in a sanitized form to show the defendants' state of mind in planning an attack on the United States).

For substantially the same reasons, the admission of Exhibit 369—which was merely a *list* of the titles of similar videos from the computer's browsing history (with several redactions)—was not an abuse of discretion. Exhibit 369 had similar probative value as Exhibit 220 and, because it involved mere titles rather than an evocative video describing scams, its effect was more muted than Exhibit 220. Because the District Court did not abuse its discretion in admitting either exhibit, Lyttle's evidentiary argument fails.[2]

\*\*\*

---

[2] Lyttle also argues that Exhibits 220 and 369 were irrelevant under Rule 401 of the Federal Rules of Evidence. But that argument fails as well. Rule 401 is not a "high standard." *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 109–10 (3d Cir. 1999). Because both exhibits made it more likely that the viewer of the video had knowledge of advance-fee lottery scams—a material fact—the evidence was relevant.

For the stated reasons, we will affirm the judgment.


Robert J. Daniels
Zachary A. Toland
Killian & Gephart

    *Counsel for Appellant*

Jeffery F. St. John
Carlo D. Marchioli
Office of United States Attorney
Middle District of Pennsylvania

    *Counsel for Appellee*